UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR19-0146-JCC |
| Plaintiff, | ORDER |
| v. | |
| CHRISTIAN DJOKO, | |
| Defendant. | |

This matter comes before the Court on Defendant Christian Djoko's motion to review and revoke the detention order of the Honorable Michelle L. Peterson, United States Magistrate Judge (Dkt. No. 58). Having considered the parties' briefing and the relevant record, the Court GRANTS the motion and REVOKES the detention order (Dkt. No. 40) for the reasons stated herein.

I. **BACKGROUND**

From September 2018 until November 2018, Mr. Djoko and two codefendants allegedly conducted a campaign of harassment against John Doe, a gay man from Cameroon who lives in Seattle. (Dkt. No. 1 at 2–6.) According to the Government, that campaign was multifaceted. (*See* Dkt. No. 73 at 4–6.) Mr. Djoko purportedly disseminated information about John Doe's sexual orientation—including nude images of John Doe and his husband—to the Cameroonian community. (*See* Dkt. No. 1 at 3–6.) Mr. Djoko is also accused of providing false information to

the United States Citizenship and Immigration Services in an attempt to have John Doe deported. (*See* Dkt. Nos. 75-3, 75-4, 75-17.) And on October 21, 2018, Mr. Djoko and codefendant Rodrigue Kamdem allegedly assaulted John Doe. (Dkt. No. 1 at 4.)

In connection with that alleged assault, the Seattle Police Department arrested Mr. Kamdem on November 3, 2018. (Dkt No. 73 at 6.) Following Mr. Kamdem's arrest, detectives telephonically interviewed Mr. Djoko about the assault on November 7. (Dkt. No. 58-6 at 1.) Two days later, a detective called Mr. Djoko's family and advised them that Mr. Djoko should report to the detective. (*Id.*) Mr. Djoko complied with the detective's request and reported to the police the next day. (*Id.*) Mr. Djoko was then charged on November 17 with malicious harassment in violation of Washington Revised Code § 9A.36.080. (Dkt. No. 73 at 6.) He was subsequently released pending trial. (*Id.*) Over the next nine months, Mr. Djoko made all his required court appearances. (*See* Dkt. No. 58 at 6.)

On August 1, 2019, a federal grand jury indicted Mr. Djoko and his two codefendants on charges of cyberstalking and conspiracy to commit cyberstalking. (Dkt. No. 1 at 2–6) The next day, the government advised Mr. Djoko's state counsel of the federal charges and informed counsel that Mr. Djoko had until August 9 to self-surrender. (Dkt. No. 58-7 at 1.) Mr. Djoko complied with the government's deadline and self-surrendered on August 8. (*Id.* at 2.) That same day, state prosecutors dismissed Mr. Djoko's malicious harassment charge. (Dkt. No. 58-6 at 2.)

After Mr. Djoko self-surrendered, the government moved to have him detained pending trial, claiming that he posed a serious risk of flight and a serious risk of obstruction of justice. (*See* Dkt. No. 14 at 1.) Pretrial services disagreed with the government's assessment and recommended that Mr. Djoko be released subject to standard and special conditions. (*See* Dkt. No. 27 at 5–6.) A detention hearing was held on August 16, 2019, before Judge Peterson. (Dkt. No. 58-1.) At the hearing, Judge Peterson found that the case qualified for a hearing because Mr. Djoko posed a serious risk of obstructing justice. (*See id.* at 40.) Judge Peterson then weighed the factors for detention under 18 U.S.C. § 3142(g), concluding that no conditions could assure Mr.

Djoko's appearance and the community's safety. (*See* Dkt. No. 40 at 1–2.) Judge Peterson therefore ordered that Mr. Djoko be detained pending trial. (*See id.* at 2–3.)

## II. DISCUSSION

The government has charged Mr. Djoko with committing deplorable acts. (*See* Dkt. No. 73 at 4–6.) Those acts, if proven true, amount to a systematic campaign to "out" a man's sexual orientation in a way that put that individual in real danger. (*See id.*) But to qualify for pretrial detention, a person must do more than commit deplorable acts; they must meet the statutory prerequisites set forth in 18 U.S.C. § 3142. The government argues that those prerequisites are met because Mr. Djoko poses a serious risk of flight and obstruction of justice, because cyberstalking is a "crime of violence," and because no condition or combination of conditions will reasonably assure the appearance of Mr. Djoko and the safety of the community. (*See* Dkt. No. 73 at 1–2.) The Court disagrees. While Mr. Djoko poses a serious risk of obstruction, the special conditions recommended by pretrial services will reasonably assure Mr. Djoko's appearance and the community's safety.

### A. Propriety of a Detention Hearing

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). To ensure that pretrial detention would continue to be an exception, Congress limited the categories of cases eligible for pretrial detention to those listed in 18 U.S.C. § 3142(f). *See United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003); *United States v. LaLonde*, 246 F. Supp. 2d 873, 875 (S.D. Ohio 2003) (quoting S. Rep. No. 98-225, at 20 (1984)) ("[T]he requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial."). Accordingly, unless the government can show by a preponderance of the evidence that a case falls into one of those categories, a defendant cannot be detained pending trial. *See United States v. Villatoro-Ventura*, 330 F. Supp. 3d 1118, 1124 (N.D. Iowa 2018); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).

In this case, the government argues that a detention hearing was appropriate for three reasons. First, the government claims that there is a "serious risk that [Mr. Djoko] will flee." *See* § 3142(f)(2)(A); (Dkt. No. 73 at 9–10). Second, the government contends that there is a "serious risk that [Mr. Djoko] will obstruct or attempt to obstruct justice." *See* § 3142(f)(2)(B); (Dkt. No. 73 at 9–10). And third, the government argues that cyberstalking is a "crime of violence." *See* § 3142(f)(1)(A); (Dkt. No. 73 at 10–12). The Court finds that the government has failed to establish a serious of risk of flight but has established a serious risk of obstruction. As a result, it is unnecessary to for the Court to consider whether cyberstalking is a "crime of violence" or if that term is, as Mr. Djoko claims, unconstitutionally vague. (*See* Dkt. No. 58 at 12–14.)

### 1. Risk of Flight

The government argues that a detention hearing was appropriate because there is a "serious risk of that [Mr. Djoko] will flee." *See* § 3142(f)(2)(A); (Dkt. No. 73 at 9–10.) The Court concludes otherwise.

To begin with, Mr. Djoko appears to have significant reasons to stay in Western Washington. Mr. Djoko has been in the country on an F1 student visa for the past seven years. (Dkt. No. 58 at 8.) During that time, Mr. Djoko has regularly enrolled in classes. (*See* Dkt. No. 58-9.) He also plans to enroll for classes this fall should he be released. (*See* Dkt. No. 58-7 at 2.) If he does not, then his visa will expire. (*See* Dkt. No. 27 at 2.)

Mr. Djoko also has the support of his family. Hivan Djoko, Mr. Djoko's brother, has "guarantee[d]" that Mr. Djoko will stay at his residence, that he will take care of Mr. Djoko's personal expenses, and that Mr. Djoko will not miss any court dates. (*See* Dkt. No. 58-8 at 1.) Hivan is willing to help, he explains, so that his brother can have "the opportunity to pursuit [sic] his dream of being an accountant." (*Id.*) And while Hivan expressed some concern to pretrial services about his brother living with him permanently, (*see* Dkt. No. 27 at 2–3), Hivan clarified in a letter to the Court that he could house Mr. Djoko for the duration of any future trial, (*see* Dkt. No. 58-8 at 1). Furthermore, Mr. Djoko appears to have the financial support of his parents,

who Mr. Djoko says are willing to assist him in securing an apartment or residence. (*See* Dkt. No. 27 at 2–3.)

In addition to having his family's support, Mr. Djoko has demonstrated that he is willing to comply with the legal process in this case. Mr. Djoko surrendered himself to authorities two different times. (*See* Dkt. Nos. 58-6 at 1, 58-7 at 2–3.) Mr. Djoko also made his required court appearances while his malicious harassment charges were pending in state court. (*See* Dkt. No. 58 at 6.)

The government responds to this record with several reasons why Mr. Djoko poses a serious risk of flight. First, the government observes that Mr. Djoko, an immigrant, lacks authorization to work in the United States but nevertheless worked for Uber. (S*ee* Dkt. No. 73 at 9–10) (citing Dkt. No. 58-1 at 15–16, 21). Yet, the government does not explain how Mr. Djoko's previous work for Uber corresponds with his flight risk. Perhaps his unauthorized work relates to the government's argument that Mr. Djoko has a "history of flaunting . . . the law." (*See* Dkt. No. 73 at 1.) If that is the argument, then it is too attenuated from the risk that Mr. Djoko will flee from prosecution.

Second, the government alleges that Mr. Djoko provided "misleading" information about his residential address to King County when he was released from custody. (*See id.* at 10) (citing Dkt. No. 75-18). But all that Mr. Djoko did was provide a PO box instead of his residential address, which could easily have been an accident. (*See* Dkt. No. 58-1 at 22.) Moreover, it seems unlikely that Mr. Djoko was attempting to deceive King County given that he had voluntarily surrendered to a detective just prior to giving the wrong address. (*See* Dkt. No. 58-6 at 1.)

Finally, the government observes that Mr. Djoko failed to appear for several misdemeanor driving offenses. (*See* Dkt. Nos. 27 at 4, 73 at 1–2.) The Court takes Mr. Djoko's failures to appear in those cases seriously. However, Mr. Djoko's failures to appear do not establish that there is a "serious risk" that Mr. Djoko will flee in this case. Unlike those prior cases, Mr. Djoko is now represented by counsel, who will work to ensure that Mr. Djoko appears

in court. (*See* Dkt. No. 58-7.) Mr. Djoko also has the support of his brother, who has promised to "make sure that Christian Fredy Djoko does not miss any of his court dates." (*See* Dkt. No. 58-8 at 1.) And for the past year, Mr. Djoko has demonstrated a willingness to comply with the legal process in this case by voluntarily surrendering to authorities and making all his required court appearances. (*See* Dkt. No. 58 at 6.)

Given that Mr. Djoko has reason to stay in the area, he has the support of his family, and he has complied with the legal process in this case, the Court concludes that there is not a serious risk that he will flee.

### 2. Risk of Obstruction

While there is not a serious risk that Mr. Djoko will flee, the Court does find that a detention hearing was appropriate because there is a "serious risk that [Mr. Djoko] will obstruct or attempt to obstruct justice." *See* § 3142(f)(2)(B); (Dkt. No. 73 at 9–10).

To establish that Mr. Djoko may obstruct justice, the government points to the fact that Mr. Djoko may have deleted text messages relevant to this case just prior to his arrest. (*See* Dkt. No. 73 at 9.) The evidence that Mr. Djoko deleted such text messages is strong. The record shows that Mr. Djoko regularly messaged his codefendants about John Doe from September 2018 until November 2018. (*See* Dkt. Nos. 75-1–75-5.) Those messages include two texts recovered from Mr. Kamdem's phone that were sent by Mr. Djoko between October 11, 2018, and November 4, 2018. (*See* Dkt. Nos. 75-2, 75-4.) Yet, when an SPD examiner conducted a logical extraction on Mr. Djoko's phone, the examiner was unable to recover any call, SMS, or location data. (*See* Dkt. No. 75-6 at 2.) The most likely explanation for the examiner's inability to recover texts known to exist is that Mr. Djoko deleted those texts between the time that Mr. Djoko learned of the SPD's investigation and the time that Mr. Djoko surrendered his phone to police on November 10, 2018. (*See* Dkt. No. 58-6 at 1.)

The government also argues that Mr. Djoko may obstruct justice given that he was allegedly willing to lie to USCIS to have John Doe deported. The evidence for this allegation is

also strong. Texts reveal that Mr. Djoko and his codefendants discussed contacting USCIS. (*See* Dkt. Nos. 75-1–75-5.) USCIS later received a fraud complaint on November 2, 2018, from the email address djokochristian1@gmail.com. (Dkt. No. 75-17.) That complaint states that John Doe was in a fraudulent marriage to a man while living with a woman—an allegation that the government represents to be false. (*See* Dkt. Nos. 73 at 10, 75-17 at 11.)

Taken together, Mr. Djoko's apparent willingness to destroy evidence and lie to authorities creates a serious risk that he may attempt to obstruct justice in some other way. The Court does note, however, that the issue is a close one. While Mr. Djoko engaged in serious acts of obstruction, those acts occurred prior to his arrest. Since that time, Mr. Djoko does not appear to have obstructed the government's investigation. (*See* Dkt. No. 76 at 2–3.) But Mr. Djoko's prior acts still warranted a detention hearing. *See* § 3142(f)(2)(B).

### B. Propriety of Detention

If a case does meet § 3142(f)'s requirements, then a judicial officer must hold a hearing to determine if a "condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community." *See* § 3142(f). In making that determination, a judicial officer must consider (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against [the defendant]"; (3) "the history and characteristics of [the defendant]"; and (4) "the nature and seriousness to any person or the community that would be posed by the [defendant's] release." *See* § 3142(g). A judicial officer must weigh those factors while keeping in mind that "doubts regarding the propriety of release be resolved in favor of the defendant." *See United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405–06 (9th Cir. 1985)). The principle that doubts be resolved in the defendant's favor is reflected in the burden of proof: there must be clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, *see* § 3124(f)(2)(B), and there must be a "clear preponderance" of the evidence that no condition or combination of conditions

ORDER
CR19-0146-JCC
PAGE - 7

will reasonably assure the defendant's appearance, *see Lopez-Valenzuela v. Cty. of Maricopa*, 719 F.3d 1054, 1065 (9th Cir. 2013).

Here, there are conditions that would reasonably assure Mr. Djoko's appearance and the safety of both John Doe and the community.

### 1. Assurance that Mr. Djoko Will Appear

As previously discussed, there is not a serious risk of flight in this case because Mr. Djoko has strong ties to the Western Washington area, his family has offered him support, and Mr. Djoko has complied with the legal process in this case. *See supra* Section II.A.1. Given that the government has failed to demonstrate a serious risk of flight, the Court concludes that pretrial services' recommended conditions will reasonably assure that Mr. Djoko will appear in court. Those conditions include:

- Mr. Djoko's travel being restricted to Western Washington and his location being restricted to his residence except for approved reasons;
- Mr. Djoko participating in the location monitoring program with Active Global Positioning Satellite Technology;
- Mr. Djoko surrendering all current and expired passports and travel documents; and
- Mr. Djoko maintaining his residence as directed.

(*See* Dkt. No. 27 at 6.) While these conditions cannot guarantee Mr. Djoko's appearance, the standard under § 3142(g) is reasonable assurance. *See United States v. Orta*, 760 F.2d 887, 889–90 (8th Cir. 1985). That standard is met here.

### 2. Assurance that John Doe and the Community Will be Safe

The more difficult question is whether there are conditions that will reasonably assure the safety of John Doe and the community. *See* § 3142(f)–(g). On the one hand, Mr. Djoko is charged with having committed deplorable and sometimes violent acts. (*See* Dkt. No. 1 at 3–5.) On the other hand, Mr. Djoko did not threaten John Doe while Mr. Djoko was released pending

ORDER
CR19-0146-JCC
PAGE - 8

trial for the state charges of malicious harassment, (*see* Dkt. No. 58 at 21), and pretrial services has recommended special conditions that would significantly inhibit Mr. Djoko's ability to harm or harass anyone, (s*ee* Dkt. No. 27 at 6). Ultimately, a careful consideration of the factors listed in § 3142(g) lead the Court to conclude that Mr. Djoko must be released.

### i. Nature and circumstances of the offense

The first factor—the nature and circumstances of the offense—favors detention. Mr. Djoko is charged with conducting a cyberstalking campaign with the intent to cause reasonable fear of serious bodily injury. (Dkt. No. 1 at 2–6.) As part of that campaign, Mr. Djoko is accused of trying to have John Doe deported to a country known to be particularly dangerous for gay men to live in—a fact that Mr. Djoko is aware of. (*See* Dkt. No. 75-5 at 2); *7 Discriminatory (or Deadly) Countries for LGBT People*, Amnesty International, https://www.legalbluebook.com/B-18-1-1 (last visited October 1, 2019). Mr. Djoko is also accused of assaulting John Doe. (*See* Dkt. No. 73 at 13.) During that assault, Mr. Djoko allegedly restrained John Doe while Mr. Kamdem forced John Doe to perform oral sex. (*See id.*) The violent nature of the assault, if true, demonstrates Mr. Djoko's hatred towards John Doe and his willingness to act on that hatred.

### ii. Weight of the evidence

The weight of the evidence, on the other hand, is mixed. In assessing that evidence, the Court is not tasked with making a pretrial determination of guilt. *Motamedi*, 767 F.2d at 1408. Instead, the evidence "can be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or the community." *Id.* The weight of the evidence is, therefore, the least important factor. *Id.*

The government has offered little evidence of the alleged assault. The only concrete piece of evidence that the government points to is a text message from an unknown individual to John Doe in which the individual references that "they"—presumably Mr. Djoko and Mr. Kamdem—"cut your ears off." (*See* Dkt. No. 75-13 at 2.) While concerning, this text message is hardly a smoking gun. Moreover, John Doe appears to have given contradictory accounts of the assault.

Defense counsel represents that in a March 2019 interview, John Doe stated that Mr. Djoko was not a knowing participant in any alleged assault. (*See* Dkt. No. 58-1 at 26–27.) John Doe also apparently stated that he could not see the alleged assailants' faces and that he assumed the two men were Cameroonian because of the greeting that they used. (*See* Dkt. No. 58 at 17–18.)

Unlike the evidence of the purported assault, the evidence of the alleged campaign of harassment is relatively strong. In its response motion, the government represents that Mr. Djoko and his codefendants took John Doe's mobile device containing materials pertaining to John Doe's sexual orientation, including nude images of John Doe and his husband. (*See* Dkt. No. 73 at 4.) They then shared those images and other materials with the Cameroonian community. (*See id.* at 4–5.) In addition, the government has provided texts that document Mr. Djoko and his codefendant's plan to have John Doe deported. (*See* Dkt. Nos. 75-1–75-5.) The government has also provided a copy of the complaint that Mr. Djoko sent to USCIS. (*See* Dkt. No. 75-17.)

### iii. *History and characteristics of the defendant*

The history and characteristics of the defendant favor release. Mr. Djoko has strong ties to the community, having lived in Washington since 2012 on a student visa. (*See* Dkt. No. 58 at 8.) He also has the financial support of his family and the support his brother, who has promised to make sure that Mr. Djoko appears in court. (*See* Dkt. Nos. 27 at 2–3, 58-8 at 1.) And while Mr. Djoko was arrested for soliciting a prostitute in July of this year, (*see* Dkt. No. 75-7), that crime does not indicate that he is likely to flee or that he is a danger to the community.

### iv. *The nature and seriousness of the danger to any person or the community posed by release*

Although Mr. Djoko is charged with serious crimes, pretrial services has recommended release conditions that will reasonably assure the safety of John Doe and the community. Those conditions would restrict Mr. Djoko to his residence at all times except for approved reasons, prohibit Mr. Djoko from contacting John Doe, and prohibit Mr. Djoko from accessing the internet without pretrial services' prior approval. (*See* Dkt. No. 27 at 6.) This latter condition

should be especially effective at reducing the risk of further harassment given that Mr. Djoko and his codefendants primarily used the internet to harass John Doe. (*See* Dkt. No. 73 at 4–5.)

Mr. Djoko's actions since his arrest bolster the Court's conclusion that there are conditions that will reasonably assure the safety of John Doe and the community. As far as the Court is aware, Mr. Djoko did not harass or threaten John Doe after Mr. Djoko was released from state prison. (*See* Dkt. No. 58 at 21.) Indeed, on the one occasion where Mr. Djoko encountered John Doe, Mr. Djoko did exactly what he was supposed to do: he walked away without saying or doing anything. (*See id.* at 9–10.) Given that Mr. Djoko did not threaten John Doe or the community when he was not subject to special release conditions, the Court is reasonably assured that he will not pose a danger if he is released subject to the conditions recommended by pretrial services. *See Orta*, 760 F.2d at 889–90.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS Mr. Djoko's motion (Dkt. No. 58); ORDERS that Judge Peterson's order of detention (Dkt. No. 40) is REVOKED; and ORDERS that Mr. Djoko shall be released on an appearance bond, subject to the standard and special conditions recommended by the United States Probation and Pretrial Office in its supplemental pretrial services report (Dkt. No. 27).

DATED this 1st day of October 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE